The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. The case today is Thomas C. Franchini v. Bangor Publishing Co., Inc. et al. Appeal No. 23-1633. Attorney Belair, please introduce yourself for the record and proceed with your argument. Thank you. Good afternoon to both of you judges. My name is Raymond Belair and I represent Thomas C. Franchini, Doctor of Podiatric Medicine. I will request two minutes, if the Court please, for rebuttal. Yes, you may have it. Okay. May I proceed, Your Honor? Yes, please. Thank you. Okay. The first thing I'm going to address is the District Court's failure to allow an eventual motion to dismiss the second amended complaint, which set forth for the first time in this litigation allegations of actual malice. All of the references that I'm going to make with respect to this point are going to be exclusively on what's contained in the second amended complaint. Now, in order to prepare the ground for that, because I'm going to be proceeding on the basis that the story that Donovan Slack and the Gannett Papers published was inherently improbable and also that they exhibited a bias. At the time that the articles were published, my client, Dr. Franchini, had been practicing as a surgical podiatrist for over 27 years and had performed approximately 5,700 procedures. In that time, no disciplinary action had ever been taken against him by any licensing authority or any hospital, and he never suffered the loss, revocation, or termination of any hospital or surgical privileges. He served for 10 years as an officer, as a surgical podiatrist in the United States Navy where he won two commendation medals and personal commendations from senators and a sitting vice president with respect to the podiatric surgery which he performed. While at VA Togus in Augusta, Maine, he performed 580 surgeries between 2004 and 2010 and was promoted from grade GS-12 to grade GS-15. In all of this time, never a single tort claim or a claim of some standard care was ever made against him. So, since no defamation plaintiff ever admits that they entertain serious doubt about, defamation defendants ever admit that they entertain serious doubt about what they have published, courts typically will infer actual malice from objective facts, as this court stated in Bose Corporation v. Consumer Union, which decision the Supreme Court affirmed. In this case, for example, defendant Slack and therefore Gannett displayed frank bias against plaintiff when he was coerced to give an interview under threat that her, this is Slack now, her article would be more damning if he did not grant that interview. And further evidence of this bias was Slack's false promise not to publish the employer, my client's employer at the time, place of employment. So instead, she broke that promise, which was false, and instead published a map of lower Manhattan showing the location and the address of the place of his employment with a graphic arrow pointing to it on the page of USA Today. As a further example, at the interview, Slack told plaintiff that he was, quote, the worst doctor in the history of the Veterans Administration and that he had, quote, botched and harmed at least 88 patients in surgeries at the VA when he was there, unquote. Plaintiff told Slack that this was not true and that the source she mentioned had been his chief of surgery who recruited him, always praised his work, operated with him on many cases, asked him to operate with him on complex cases instead of recruiting orthopedic surgeons, always gave him positive fitness reports, and was responsible for plaintiff being promoted from grade GS-12 to grade GS-15. When Slack admitted that she could tell within a day or two whether a journalistic colleague was competent or not, plaintiff asked her whether she should not at least question the source about what he alleged in view of Dr. Franchini's theretofore spotless record including decades of competent service until it was expedient for the source not to do so years after he left the VA. Donovan Slack merely shrugged. Similarly, plaintiff asked whether if what Slack was claiming were true, would that not mean the plaintiff was harming nearly 50 percent, thousands of patients he had treated? And Slack agreed. Since plaintiff had never had so much as a complaint, much as a finding of malpractice in his entire surgical career, plaintiff asked where the other thousands of claimants were. Counsel, counsel, I understand that you've chosen to argue that your complaint adequately, your second amended complaint adequately set forth actual malice. But the defamation claim is not as to what was said in the interview. It was what was published in the article. OK, so could time is running on you. Could I move you to whether there's anything in the article itself which you say demonstrates actual malice? No, no, but but what I am saying is that she did not investigate things when invited to do so. She asked for the interview and brushed aside all of the points that my client was making, never conducted any interviews with the people he said she should talk to. I don't think I can I can make out a case for actual malice, except in the complaint by allegations, and we haven't had any discovery on that yet. OK, but all of this stuff that she said in the interview was the interview recorded or is this your client's memory? It's in his complaint verbatim. That doesn't answer my question. I'm sorry. It's my client's statement of what happened. All right. It's his memory of what happened. OK, I'm not sure why you need a discovery as to his memory of what happened. But can I move you along to whether your client is a voluntary public figure, having gotten himself into a matter of more than trivial public interest, which is the adequacy of health care at the V.A. hospitals in the country and in particular in Maine? Yes, Your Honor. Can I just add here, I'm surprised you started off with the motion to amend since it struck me that the constitutional issues on whether somebody's a limited public figure seem to be the heart of the controversy. So are you basically saying that we should resolve that the motion to amend is the critical issue here? Well, it's a critical issue, Judge. It was foreclosed that I think if the court sees fit to send this back to the district court, I would like to pursue that claim. That's all. But no, that's not the only thing. I intend to argue limited public figure very strongly.  Yes, yes, of course. But when these articles were published, my client was nine years removed from a position of chief of podiatry, which was a position that had no responsibilities whatsoever except to practice as any staff physician would. That's supported not only by my client's declaration, but the direct declaration of two former V.A. doctors who were themselves a chief of podiatry. He couldn't even order gauze on his own. He attracted no attention whatsoever. Now, with respect to what the controversy is, at first, it seems to be that what we're talking about is the age old problem of understaffing of V.A. hospitals in rural areas. Always a problem. But Dr. Franchini never uttered a word on the subject while he was at V.A. Togas, when he resigned to enter private practice. And he never said anything on that subject at any other time. He was virtually invisible. At this time, I see I'm running out of time, but I would like to withdraw my request for rebuttal and just continue on for what time I have. If it's all right, go ahead. Go ahead. So can I jump in and make sure you talk about the blog in the time remaining? Yes, the blog. The blog was he did that for a reason. He was employed at that time as by a doctor in Connecticut. And he had a young son who was a techie and looked up everything. And he found Chief Judge Levy's statement of what the claims were in that particular case. And then he was terminated. He put that up as he testified in deposition because if somebody were to do that again, he wanted to be able to have a denial on the blog of what they were saying in the Tort Claims Act cases so that they would get both sides of the story. And incidentally, Judge Sarah, since you mentioned the blog, that had no external hits until after the publication was made. And that was by a corpsman who said he's a nice guy. So he would check it himself and there were no hits on that. And it was only self-defense, which I rely on the Breras case and Pendleton and even Firestone that have to do with not becoming a public figure. I don't understand why instead of a private response to that particular employer or any future employer, a decision is made to go public. A blog is very public. And unless there is a direct link between Judge Levy's order and the blog, I just don't see how this serves any purpose other than a public purpose. Well, if he's defending himself and that's all that he did in the blog, he listed what had happened. He listed his accomplishments. He listed that he had been falsely accused. All he did was deny the allegations that were being made in the federal Tort Claims Act cases. And in a way, he made more public what those allegations were. I mean, yes. I'm sorry. Because the privilege of a reply, it's mentioned at least twice, I think twice in the First Circuit and in certain other circuits. But it's a limited one, right? It's got to be proportionate to what happened here. And he put in 11 blog posts. We only have, I think in the record, I think I'm right, only the first one. But still, he was injecting himself into the controversy over the quality of care at Togus as well as his own role in it. It seems as if it's even under Liberis and the Portage case, the Fourth Circuit case, et cetera, like he's going beyond actually what the allegations are in the federal Tort Claims Act case or the federal investigations in Congress. It's, I'm wondering whether the privilege of a reply sort of ambitiates his throwing himself into the controversy. That blog didn't deal with anything except himself. He didn't make any statement whatsoever in that blog about what was going on otherwise. He was talking about how he was blameless. That's all. And I think that... Well, as I read the blog posting, didn't he sound off a bit on his view of the American health care system? Only as it applied to him in that case because of the false claims that had been made, Judge. And I'm running out of time here, but let me just continue. I'm not going to be able to finish all of that. I do want to point out that with respect to involuntary public figure, well, first of all, the blog was just denials. That I believe is protected under Liberis. I hope the court can agree with that. With respect to involuntary public figure, the cases that are cited are approximately Well, the air traffic controller case, that person in the D.C. circuit conceded that he was a public figure. The Zupnik case, the plaintiff had already been written up as having defrauded both her husband, insurers, and an alleged association. Counsel, believe me, we've read your brief and that's all in your brief. I'm sorry, Judge Lynch, one of the attorneys, the other attorney who's supposed to argue has just dropped out of the meeting. I wonder if you want to pause for a minute while I get him back. I'm sorry that happened. All right. We will pause and then, Mr. Biller, I'll give you a minute to sum up your argument, okay? Yes, Judge. Okay, I believe counsel is back. I apologize, Your Honor, I don't know what happened. I just disappeared for a minute. Very good. Judge, if you would like, we can go back on the record. Yes, Judge, we're back on the record. And Attorney Biller, if you would go ahead and follow the judge's instructions with regard to summing up. Yes, thank you. You have one minute, not ten. Thank you, Your Honor. I'll watch carefully. All of these injecting into and thrusting into a public controversy in this case didn't happen because all of what Dr. Francini did, the forecaster article, the blog post, the letter to Judge Levy, the declaration that he filed in the Federal Tort Claims Act cases, all of that was limited to he never committed a fraud and he didn't do any of the things that he said happened. And what, in fact, happened was the VA administration had anger on their face, they solicited claims, and all he ever did was say in the blog and anything else, no, that's not true. That's all he did. Thank you, Your Honor. Thank you. Thank you, counsel. At this time, would Attorney Beller please mute his camera and his microphone? And would Attorney Ruprecht please unmute his camera and unmute his microphone so we can see and hear him? Attorney Ruprecht, please introduce yourself on the record to begin. Good afternoon, and may it please the Court. My name is Cliff Ruprecht. I represent USA Today and Donovan Slack. As I said earlier, I'll be presenting argument on behalf of all the defendant at police. Their counsel are here should the Court have questions for them. Your Honor, let me begin where we just left off, which was with the blog. It's pretty clear that Dr. Francini did a lot more than just deny that he had committed any errors on that blog. As the Court noted, he took on the American health care system. He also spoke out on the propriety and fairness of the statute of limitations or statute of repose, which was a defense that had nothing to do with whether he had committed any malpractice or not. It was something that was being asserted by the United States as a defense in the Federal Tort Claims Act. And the fairness of that and the fairness of VA's treatment of veterans and the fairness of denying their claims as time barred was a key part of the public controversy that was ongoing and that predated any of the publications that are at issue here. He impugned the motives of the patients, saying that they were in it for the money. And he didn't just put his defense out there, but he tried to open a public forum for discussion by soliciting, in his words, thoughts. As the conclusion of his first post, he was trying to open up a public forum specifically to invite debate over these matters, not to shut down debate of what went on at VA and his role in it. The District Court had ample evidence to support its finding that long before Dr. Franchini joined the VA TOGUS in 2004, there was a long-term public controversy nationally over the adequacy of the delivery of health care to veterans by the VA, and specifically about the ability of VA TOGUS to adequately meet the needs of veterans, including delays in providing them treatment. That's cited in the District Court's opinion. Dr. Franchini says that his joining VA TOGUS played a role in reducing that backlog. That is cited in the District Court's opinion. He took on a role to help affect that issue. So that issue existed at the time that he was a doctor at TOGUS. That probably, in itself, would be a positional, voluntary assumption of risk that your performance might be. Our counsel. Yes. Go on to another point. Very well, Your Honor. The voluntary assumption, I think, of a role in this controversy is pretty clear. It goes beyond the blog. It goes beyond the taking the job. He reached out prior to any of these publications to try to shape the debate. He reached out to the forecaster. Well, can I ask you, at some point, if a reporter calls you up and says, I'm going to write a bad article about you unless you talk to me, is talking to someone, talking to the reporter enough to inject yourself into the vortex, or does that fall within the privilege of reply? There were a number of things that District Court cited. I'm not sure we need to go into each one, but at some level, I mean, you can understand why he feels if a reporter calls him, he needed to defend himself. I'm not quarreling with that, Your Honor. I think there's a couple of points that we need to make on that. One is, I mean, the privilege of reply wasn't adopted by this court in Liberis, and in footnote 12 of the opinion, the court actually expresses doubt about the justification of grafting a common law defense, right? I can agree with you, but regardless, replying to a reporter who says, it'll be worse if you don't talk to me, does go independently, not to the privilege of reply, but voluntarily injecting yourself into a public controversy. Sure, I can understand how in certain cases that would be the case. Here, what Dr. Franchini says his purpose was, like it was with his blog in talking to Donovan Slack, and Mr. Blair just referred to it as he was wrapping up, Dr. Franchini himself says the reason that he spoke to Donovan Slack was to get her not to not report these allegations against him. The reason he says he spoke to Donovan Slack was to get her to report, to urge her to report on what happened to him at VA, but to tell what he calls the real story, which is that VA is corrupt and VA is incompetent, and these are his words, not mine, and that the investigation of him was, in his words again, a witch hunt. And he stated, and this is in the summary judgment record, that that was his purpose in talking to Donovan Slack, was not to dissuade her from reporting about VA's investigation, but indeed to urge her to report about that investigation, which centered on him, and to tell his side of it, which is that it was corrupt and a witch hunt. And in fact, she did report his side of the story. That was, you know, that goes more to the actual malice, the absence of actual malice, which, you know, was a very solid base for the court's finding that the complaint didn't allege actual malice. I'm happy to spend some time talking about the motion to amend if the court wishes me to do so. I will stop. Can I go back to what you just said? It strikes me there is a difference between talking to a reporter not to get her to quash the story, because reporters don't quash stories, but to be sure your denial is part of the story. So let's put aside that part of your argument. But going beyond to attack the VA strikes me as a sort of a different kettle of fish. As you said, he said the VA was incompetent, it was corrupt, and all of this was just a witch hunt. In a sense, he's trying to explain why he thinks the charges were brought. And I suppose that could be a kind of a denial or a setting of context. But even if, assuming arguendo, we were to look at a common law privilege of reply, would that further step fall within a common law privilege of reply? I don't believe it would, Your Honor. I think that you can broaden your discussion to the point where you are participating in the broader controversy. He's no longer really talking about just him and his patients, but he's talking about the very issue that was the issue of the reporting. Remember that the USA Today story was a story about a nationwide investigation of a failure of oversight at the VA, a failure to follow up appropriately on the results of their own bringing to the attention. I'm sorry, Your Honor. No, no, no. I'm just trying to, if you look at the facts behind some of these privilege of reply cases, one of them clearly went beyond. Liberis was actually talking about sugar plantations, the conditions of sugar plantations. Lunches were held. Fortich, which was the Fourth Circuit case everyone's citing, was grandparents, right, accused of sexual abuse, and they felt like they had to defend themselves. So where would you say this falls in the spectrum? Because it's hard to blame him for responding to a court case or responding to a reporter. It strikes me that the blog goes above and beyond, but I'm not sure we need to say all those other things that you're relying on.  I think Fortich, the court emphasizes more than once in that opinion that the grandparents were defending themselves against allegations that were of criminal conduct. I mean, they weren't being charged with a crime, but what was being alleged to them, the court emphasizes over and over again, is conduct that would constitute a crime. This court in Liberis said that it didn't quarrel with Fortich to the extent that it said that a person doesn't necessarily become a public figure merely solely because they defend themselves against a heinous allegation. So we don't have the kind of heinous allegation here that was at issue in Fortich. We don't have a plaintiff who solely replied to allegations, but in fact, with the blog and otherwise tried to broaden the public discussion about what was going on with these allegations, urged the publisher that he sues now to publish about the events. So I think that, I guess the last thing is, it's Liberis, to the extent that it recognizes the privilege of reply, and it's not clear, like I said, in footnote 12, it's not clear at all that the court was adopting that privilege or grafting it onto the constitutional analysis here. It does not, or it has not done that. I would have grave reservations about doing that. But counsel, let's step back. It appears that the actual malice standard is itself under attack by certain Supreme Court justices. Do you have anything to say on that point? In fact, I do. It's no secret that there are members of the Supreme Court who have stated publicly that it may be time to revisit New York Times against Sullivan. And so far, that has not garnered even four votes for certiorari. But that issue is out there. I don't know, you know, none of us could predict even what the new contours would be. I think there are a few things, though. I think if we look at what's going on in the states where the substantive defamation law comes from, I think legislatively what we see is a real tendency to actually tend in the direction of the old Rosenblum standard that gets displaced. That is to protect essentially any speech that is on a matter of public controversy. And so the Uniform Public Expression Protection Act, they don't call it anti-SLAPP anymore. It's the Uniform Commission who calls it the Uniform Public Expression Protection Act. It's been adopted.  And it's been adopted. I don't know how many states have actually adopted it so far. Two or three, I believe. There are many that have it under consideration. And I think that, you know, that may render a lot of this moot. What would be left of the constitutional contours, we don't know. If the Supreme Court were to change the United States First Amendment, 14th Amendment law on this score, we don't know whether the states would interpret their own constitutions the same way. Can I just jump in quickly because I want to make sure you address the point that your brother started off with, which is that in any event, the court erred by denying as futile the attempt to amend the complaint. Your Honor, I mean, first of all, the... I know you only have a few seconds left, but I want to make sure you don't... Let me just say, the plaintiff conceded that the First Amendment complaint did not allege actual malice. The proposed Second Amendment complaint added only 13 paragraphs. Four of those paragraphs were clearly allegations of what this court has called actual malice   invoking against the other defendants and my clients, the actual malice bud words. And then nine paragraphs that were addressed to what happened in the meeting with Donovan Slack, all of which the court went through item by item and showed why either the statements were actually presented by Donovan Slack in her article, or the allegations were otherwise legally sufficient because all they were were a bare allegation of a failure to investigate without any required pleading that the failure to investigate was motivated by a knowledge that investigation would uncover falsity of what was being stated in the article. There basically was nothing that amounted to actual malice. And then bare allegations of bias. She didn't like me, which is plainly insufficient as a pleading of actual malice because actual malice is not subjective like or dislike of a person. It is subjective knowledge or reckless disregard of the untruth of what one is stating. And there was nothing to support such a conclusion in any of the paragraphs that were added. But the large point is the court went through item by item everything that was new in the proposed amended complaint and said, here's why it's not. Here's why it doesn't plead actual malice. And in the opening brief before this court, plaintiffs didn't take on any of that, didn't say here was the error of law that was committed in construing actual malice. Here's a specific allegation that I made that qualifies as actual malice. None of it. Here's why. Here's what the court said about that allegation. And here's why it's wrong. You see none of that in the brief that was presented. And there really is none of it because the district court's analysis of it was quite thorough. Lastly, there was a procedural default in the motion to plead actual malice, to plead the second amended complaint. The court did not reach the procedural default below because it found that substantively the pleading was futile. But there was no attempt to address in the opening brief why the motion was even procedurally proper in light of the procedural improprieties that we had raised below. So that might be an independent ground. But I don't think the court needs it because substantively the district court's decision was so thorough on the point. My clock keeps resetting, it looks like. I don't know if I've gone beyond my time or not. Judge Saras, do you have any further questions? No, thank you. No. Would you like to sum up? I'll give you one minute to sum up. Thank you, Your Honor. I think that it's, I don't, I think when we step back and we look at all of the limited public figure law, I think we can get, I think we can get kind of into the weeds on is this voluntary, is this involuntary. I think if you look at the cases, I think what we see is the kind of three-part analysis that this court adopted in gray from the 11th Circuit Sylvester case, which is, is there a public controversy? What is the involvement of the plaintiff in that public controversy? And are the alleged affirmations germane to that public controversy? As to the first and the third elements, I don't think there's any dispute. The only question, and this is where the, where the limited purpose public figure issues really come down, is what is the nature of the involvement? I think there are questions of factual involvement, and then I think there are questions of foreseeability, much like we see when we do approximate cause analysis. I think we step back and we say, boy, if you're really central, I see my time is up. Can I just finish my? Yes, of course. My point, thank you, Your Honor. I think when we step back and we say, when somebody is really central, we can, they can have really no voluntary injection. That's what we see in the Dameron case. He's just so central to such a, to such a narrow sort of public controversy that he becomes what we call an involuntary public figure. At the other end, you can have people who are, who are really accidentally drawn into something that is of, of public attention. And, but they haven't really done anything voluntarily to insert themselves into that. And there, the sort of balance of factors is going to, is going to make them not be a public figure. And Judge Sarris, that was the Al-Rabi decision with the Boston Marathon bombing. Contrast that to the Jewell decision with the Olympic Park bombing, where he's involuntarily drawn in, he's, he just unforeseeably is at an event where something terrible happens. But then he does a lot of things to, to voluntarily inject himself in that. So I think the analysis is always actually that balancing of how factually central are you, and what, what voluntariness did you have in your role? And you take a holistic analysis of it. Here, I think the district court was completely correct that he was both just purely an involuntary public figure because he was so central to the congressional investigations and the FTCA suits, and also that he had taken these voluntary steps that we've talked about to make himself also a voluntary public figure. But that will rest on our briefs, Your Honor. Okay. Thank you very much. Thank you both. Thank you.